UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

NEW AMSTERDAM CAPITAL PARTNERS,    :
LLC,
                                   :

                   Plaintiff,      :      12 Civ. 7621 (VSB)(HBP)

                                   :

   -against-                              REPORT AND

                                   :      RECOMMENDATION

GREGORY KRASOVSKY, d/b/a THE LAW
OFFICES OF GREGORY KRASOVSKY,      :

                   Defendant.      :

----------------------------------X


          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE VERNON S. BRODERICK, United States

District Judge,


I.  Introduction


          Plaintiff New Amsterdam Capital Partners, LLC commenced

this action against defendant Gregory Krasovsky asserting four

claims -- tortious interference with contract, tortious interfer-

ence with business relations, violation of New York Judiciary Law

§ 487 and breach of contract (Complaint, dated Oct. 2, 2012

(Docket Item ("D.I.") 1) ("Compl.")).  Defendant failed to timely

answer or move with respect to the complaint.  Accordingly, on

March 6, 2013, the Honorable Victor Marrero, United States

District Judge, entered a default judgment (Default Judgment, dated Mar. 6, 2013 (D.I. 10)).

Defendant appealed the default judgment to the Court of Appeals for the Second Circuit (Notice of Appeal, dated Apr. 5, 2013 (D.I. 12)), and that appeal was dismissed (Mandate of United States Court of Appeals for the Second Circuit, dated June 4, 2013 (D.I. 14)). This matter was then referred to me to conduct an inquest concerning plaintiff's damages (Order of Reference, dated July 1, 2013 (D.I. 19)).[1]

Pursuant to the Order of Reference, I issued a Scheduling Order directing plaintiff to serve and file its proposed findings of fact and conclusions of law by September 12, 2013 and defendant to submit responsive materials by October 11, 2013. My Scheduling Order further provided:

> IF DEFENDANT (1) FAILS TO RESPOND TO PLAINTIFF['S] SUBMISSIONS, OR (2) FAILS TO CONTACT MY CHAMBERS BY OCTOBER 11, 2013 AND REQUEST AN IN-COURT HEARING, IT IS MY INTENTION TO ISSUE A REPORT AND RECOMMENDATION CONCERNING DAMAGES ON THE BASIS OF PLAINTIFF['S] WRITTEN SUBMISSIONS ALONE WITHOUT AN IN-COURT HEARING. See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997); Fustok v. ContiCommodity Services Inc., 873 F.2d 38, 40 (2d Cir. 1989) ("[I]t [is] not necessary for the District Court

---

[1] By Notice of Motion, dated March 5, 2014 (D.I. 29), and Notice of Motion, dated March 6, 2014 (D.I. 33), defendant moved to set aside the default judgment, compel arbitration and dismiss the complaint. Judge Broderick denied defendant's motions on March 10, 2014 (Order, dated Mar. 10 2014 (D.I. 37)).

> to hold a hearing, as long as it ensured that there was
> a basis for the damages specified in a default judg-
> ment.")

(Scheduling Order, dated July 12, 2013 (D.I. 21) (emphasis in

original)).

On October 23, 2013, I issued an Order extending

defendant's time to make his responsive submission to October 31,

2013, but noted that I was unwilling to extend the deadline

further.  In my October 23, 2013 Order, I also wrote:

> Defendant is reminded that his submission is to be
> limited to the amount of damages only.  The issue of
> liability has already been resolved as a result of
> defendant's default, and, in any event, the matter has
> been referred to me only for an assessment of damages.
> If defendant attempts to argue liability in his submis-
> sion, I shall not attempt to separate liability argu-
> ments from damages arguments, but shall instead disre-
> gard defendant's submission in its entirety.

(Order, dated Oct. 23, 2013 (D.I. 28) (emphasis added)).

Defendant submitted a letter on October 31, 2013

seeking a stay of the inquest and protection of certain confiden-

tial and/or privileged information that purportedly relates to

plaintiff's claimed damages.  Plaintiff's letter further requests

that, if I decline to stay the inquest and issue orders protect-

ing the confidential information, his October 31, 2013 letter, as

well as three prior letters submitted to the court, dated October

16, 2013, October 21, 2013, and October 23, 2013, be deemed his

opposition to plaintiff's damages submissions (Defendant's Letter to the Undersigned, dated Oct. 31, 2013,[2] at 7).

In support of the requested relief set forth above, defendant's letter includes several arguments related to his underlying liability -- specifically, that certain contracts between plaintiff and Dr. Michael Wilson, Esq. are invalid and unenforceable for various reasons. As stated in my October 23, 2013 Order, I shall not attempt to separate liability arguments from damages arguments, nor shall I further extend the deadline for defendant to submit his opposition beyond October 31, 2013.

Accordingly, I disregard defendant's October 31, 2013 submission in its entirety and make the following findings of fact and conclusions of law on the basis of plaintiff's written submissions alone.

II. <u>Findings of Fact</u>

1. Plaintiff New Amsterdam Capital Partners, LLC is a Delaware company registered to do business in New York as "LawMax

---

[2]This letter, and several other documents cited herein, are being docketed simultaneously with the filing of this Report and Recommendation.

Legal Finance" (Compl., ¶ 1[3]; Declaration of Max Volsky, dated July 3, 2013 (D.I. 25) ("Volsky Decl."), ¶ 1)).

     2.  Plaintiff's principal place of business is New York, New York (Compl., ¶ 1; Volsky Decl., ¶ 1).

     3.  Plaintiff is engaged in the business of providing investment funding on a non-recourse basis to attorneys who are engaged in litigations matters (Compl., ¶ 2; Volsky Decl., ¶ 4).

     4.  Defendant Gregory Krasovsky, Esq. is an attorney with his principal residence in Fairfax, Virginia (Compl., ¶ 3).

     5.  Defendant does business as "The Law Offices of Gregory Krasovsky," with a principal place of business in Washington, D.C. (Compl., ¶ 4).

     6.  Defendant worked as an independent contractor for plaintiff from August 2004 through June 2006 (Compl., ¶¶ 5-6).

     7.  During the time that defendant worked for plaintiff, defendant learned about plaintiff's confidential business practices (Compl., ¶ 6).

---

    [3]As a result of defendant's default, all of the allegations of the complaint, except as to the amount of damages, must be taken as true. <u>Bambu Sales, Inc. v. Ozak Trading Inc.</u>, 58 F.3d 849, 854 (2d Cir. 1995); <u>Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.</u>, 973 F.2d 155, 158-59 (2d Cir. 1992); <u>Trans World Airlines, Inc. v. Hughes</u>, 449 F.2d 51, 69-70 (2d Cir. 1971), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 409 U.S. 363 (1973).

8.   During the time that defendant worked for plaintiff, defendant was not licensed to practice law (Compl., ¶ 5).

9.   Defendant's relationship with plaintiff was governed by a Consulting Agreement, executed on or about August 12, 2004 by plaintiff and Ruscomb Associates, Inc. ("Ruscomb"), a company owned by defendant (Compl., ¶ 5; Volsky Decl., ¶ 9; Plaintiff's Exhibits in Support of Damages upon Inquest ("Pl. Exhibits"), Ex. C ("Consulting Agreement")).  Pursuant to the Consulting Agreement, Ruscomb was to create a collections department for plaintiff (Consulting Agreement, ¶ 1).

10.   The Consulting Agreement contains the following non-disclosure provision (Compl., ¶ 10; Volsky Decl., ¶ 11).

> [T]he parties agree that at all times during the term of this AGREEMENT and after its termination, a party shall not divulge, communicate, use to the detriment of the other party or for the benefit of any other person or entity, or misuse in any way, any Confidential Information (as hereinafter defined) pertaining to the business of the parties.
>
> Any Confidential Information or data now or hereafter acquired by a party to the AGREEMENT ("RECEIVER") with respect to the business of the other party ("PROVIDER"), which shall include, but not be limited to, information concerning PROVIDER'S financial condition, prospects, technology, customers, suppliers, sources of leads and methods of doing business, shall be deemed a valuable, special and unique asset of PROVIDER that is received by RECEIVER in confidence and as a fiduciary, and RECEIVER shall remain a fiduciary of PROVIDER with respect to all of such information.

> For purposes of this AGREEMENT, "Confidential Informa-
> tion" means information disclosed to RECEIVER or known
> by RECEIVER as a consequence of or through RECEIVER's
> relationship with PROVIDER (including information
> conceived, originated, discovered or developed by
> CONSULTANT [Ruscomb] during the performance of his
> duties under this AGREEMENT) prior to or after the date
> hereof (up to the date of termination of this AGREE-
> MENT), and is not generally known to the public and/or
> available in the public domain.

> Notwithstanding any other remedies available to CLIENT
> [New Amsterdam Capital Partners, LLC] hereunder, at law
> or in equity, including monetary damages, CONSULTANT
> [Ruscomb] agrees that CLIENT [New Amsterdam Capital
> Partners, LLC] may discontinue any payments to CONSUL-
> TANT [Ruscomb] under this AGREEMENT in the event of a
> breach by CONSULTANT [Ruscomb] of this Article.

(Consulting Agreement, ¶ 11).

11.   From 2001 through 2012, plaintiff had a business relationship with Dr. Michael Wilson, Esq., a medical malpractice attorney in Washington D.C., pursuant to which plaintiff provided litigation financing for Dr. Wilson so that he could represent litigants in medical malpractice cases (Compl., ¶¶ 11, 29; Volsky Decl., ¶¶ 5, 12).

12.   Plaintiff financed matters for Dr. Wilson through Contingent Asset Purchase Agreements ("CAPAs") (Compl., ¶ 11; Volsky Decl., ¶¶ 4-5, 11-12; see Pl. Exhibits, Ex. A). Each CAPA is a written contract that gave plaintiff a non-recourse interest in the outcome of an underlying matter being litigated by Dr.

Wilson in exchange for litigation financing (Volsky Decl., ¶ 7; see also Compl., ¶ 12).

13.  By signing the CAPAs, Dr. Wilson agreed to pay certain amounts to plaintiff, including the principal investment made by plaintiff and additional fees, if he secured a settlement or judgment in the underlying litigation (Volsky Decl., ¶ 7).  If he did not secure a settlement or judgment, Dr. Wilson was not required to repay plaintiff (Volsky Decl., ¶ 7).  The rates of repayment, and all other contractual terms, were jointly negotiated by plaintiff and Dr. Wilson (Volsky Decl., ¶ 7).

14.  Dr. Wilson generally made payment on the amounts he owed plaintiff (see Volsky Decl., ¶¶ 14-15; Pl. Exhibits, Ex. B).  On occasion, however, Dr. Wilson and plaintiff revised the payment schedule such that plaintiff would accept partial payment on a particular CAPA with the understanding that the remainder of the debt would be due from subsequent settlements as they were received by Dr. Wilson (Volsky Decl., ¶ 13).

15.  While he was employed by plaintiff, defendant was responsible for receiving requests from Dr. Wilson for additional funding, requesting and receiving status updates on the underlying litigation matters, receiving Dr. Wilson's proposals for repayment schedules and conveying plaintiff's position on those schedules (Compl., ¶ 11; Volsky Decl., ¶ 12).

8

16.  On June 3, 2006, plaintiff terminated defendant based on poor performance (Compl., ¶ 13; Volsky Decl., ¶ 20; Pl. Exhibits, Ex. F).

17.  At some point after he was terminated by plaintiff, defendant moved his offices into a space shared with Dr. Wilson in Washington, D.C. (Compl., ¶ 14; Volsky Decl., ¶ 20) and became licensed to practice law (see Compl., ¶¶ 3, 5; Volsky Decl., ¶ 18).

18.  On or about May 11, 2009, plaintiff sent an invoice to Dr. Wilson listing the amounts owed on eight contracts -- a refinancing agreement dated March 28, 2006 (the "Refinancing Agreement") and seven CAPAs dated February 16, 2007, March 23, 2007, April 16, 2007, June 14, 2007, July 25, 2007, January 16, 2008 and May 16, 2008 respectively (Volsky Decl., ¶ 15; Pl. Exhibits, Ex. D; see also Plaintiff's Memorandum of Law in Support of Damages upon Inquest, dated Sept. 11, 2013 (D.I. 23) ("Pl. Memo"), at 7-8).  According to the invoice, Dr. Wilson had previously made payments to plaintiff totaling $465,333.33 on these eight contracts and the remaining amount due at the time the invoice was sent was $1,149,687.45.

19.  The last payment that Dr. Wilson made to plaintiff was on July 28, 2009 for $60,000 (Volsky Decl., ¶ 16; see also Compl., ¶ 15).

20.   On September 28, 2009, Dr. Wilson gave his file concerning his dealings with plaintiff to defendant for "review and advisement" (Compl., ¶ 16).  At that time, Dr. Wilson also hired defendant's wife as a legal assistant (Compl., ¶ 16).

21.   Defendant signed a retainer agreement with Dr. Wilson on November 11, 2009, pursuant to which defendant formally agreed to provide legal representation to Dr. Wilson in connection with Dr. Wilson's dealings with plaintiff (Compl., ¶ 20; Volsky Decl., ¶ 18).  By signing the retainer agreement, defendant violated ABA Model Rules of Professional Conduct 1.7, 1.8 and 3.7 (Compl., ¶ 20).

22.   At the time of the signing of the retainer agreement and thereafter, defendant intentionally and unjustifiably encouraged, advised and counseled Dr. Wilson to breach the Refinancing Agreement and the CAPAs upon which amounts remained due by refusing to make payments owed plaintiff (Compl., ¶¶ 21-23; see also Volsky Decl., ¶ 22).  Defendant used plaintiff's confidential and proprietary information in connection with this conduct, without informing plaintiff or securing plaintiff's consent (Compl., ¶¶ 19, 38; see also Volsky Decl., ¶ 18).

23.   At the time defendant induced Dr. Wilson to breach the Refinancing Agreement and the outstanding CAPAs, defendant was aware of plaintiff's relationship with Dr. Wilson (Compl., ¶

10

30).  Defendant also was aware that the CAPAs and the Refinancing Agreement were valid and enforceable contracts (Compl., ¶ 24).

24.  After defendant advised, encouraged and counseled Dr. Wilson not to repay the Refinancing Agreement and outstanding CAPAs, Dr. Wilson refused to make further payments to plaintiff, breaching the outstanding CAPAs and the Refinancing Agreement (Compl., ¶ 25; Volsky Decl., ¶ 17).

25.  Defendant's actions were motivated by his ownership of or employment by a competing legal funding company, "Anglo-American Legal Finance Group" (Compl., ¶ 33).  Accordingly, defendant "acted out of malice and used improper or illegal means that amounted to an independent tort, and, further, . . . violated the Code of Professional Responsibility" (Compl., ¶ 32; see also Volsky Decl., ¶¶ 20-21, 44).

26.  In 2011, plaintiff commenced a lawsuit against Dr. Wilson, seeking to recover damages for his breach of the CAPAs and the Refinancing Agreement:  New Amsterdam Capital Partners, LLC v. Wilson, 11 Civ. 9716 (RLE) (S.D.N.Y.) (Ellis, M.J.) (the "Wilson matter") (Volsky Decl., ¶ 17; see Compl., ¶ 26).  Dr. Wilson retained defendant as a fact and expert witness and as an "advocate"[4] in that matter (Volsky Decl., ¶ 18).  Dr. Wilson

---

[4]Plaintiff states that defendant was employed by Dr. Wilson
(continued...)

informed the court that defendant had provided him with an
intimate working knowledge of plaintiff's business (Volsky Decl.,
¶ 18).  Defendant also planned to testify on Dr. Wilson's behalf
that the CAPAs and Refinancing Agreement were void on grounds of
usury (Volsky Decl., ¶ 18).  That lawsuit has been stayed pending
the resolution of Dr. Wilson's bankruptcy.  New Amsterdam Capital
Partners, LLC v. Wilson, 11 Civ. 9716 (RLE), Docket Item 93,
(S.D.N.Y. Feb. 11, 2016) (Ellis, M.J.) (order staying action).[5]

III.  Conclusions of Law

        27.  "'[W]hile a party's default is deemed to consti-
tute a concession of all well pleaded allegations of liability,
it is not considered an admission of damages.'"  Renaissance
Search Partners v. Renaissance Ltd. LLC, 12 Civ. 5638 (DLC), 2014
WL 4928945 at *4 (S.D.N.Y. Oct. 1, 2014) (Cote, D.J.), quoting
Cement & Concrete Workers Dist. Council Welfare Fund v. Metro
Found. Contractors Inc., 699 F.3d 230, 234 (2d Cir. 2012).

---

(...continued)
as an advocate; however, defendant was not counsel of record for
Dr. Wilson (see Pl. Memo, at 8-10).

    [5]I take judicial notice of the status of the Wilson matter.
See Guzman v. United States, 11 Civ. 5834 (JPO), 2013 WL 543343
at *3 (S.D.N.Y. Feb. 14, 2013) (Oetken, D.J.) ("It is common and
entirely proper for courts to take judicial notice of other court
proceedings."), on reconsideration, 2013 WL 5018553 (S.D.N.Y.
Sept. 13, 2013).

28.   Therefore, even where, as here, defendants have defaulted, the court must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999).

29.   To determine damages, a court may rely on detailed affidavits and documentary evidence in lieu of an evidentiary hearing. Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991); see Fed.R.Civ.P. 55(b)(2)(B) ("The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to . . . determine the amount of damages." (emphasis added)); accord Trustees of Mason Tenders District Council Welfare Fund, Pension Fund, Annuity Fund & Training Program Fund v. Stevenson Contracting Corp., 05 Civ. 5546 (GBD)(DF), 2008 WL 3155122 at *4 (S.D.N.Y. June 19, 2008) (Freeman, M.J.) (Report & Recommendation), adopted at, 2008 WL 2940517 (S.D.N.Y. July 29, 2008) (Daniels, D.J.).

30.   Accordingly, and in light of defendant's default and his failure to abide by my order directing him not to make liability arguments in his damages submissions, I rely on the statements and evidence contained in plaintiff's affidavits and submitted documentation regarding the amounts owed on the con-

tracts between plaintiff and Dr. Wilson and deem such evidence, except where it is internally inconsistent, to be correct.

A.   Plaintiff's Claim for
     Tortious Interference with Contract

31.   Pursuant to its tortious-interference-with-con-tract claim, plaintiff seeks the money owed by Dr. Wilson on the CAPAs and the Refinancing Agreement (Pl. Memo, at 12-13).[6]

32.   A federal court sitting in diversity must apply the law of the state in which it sits, including the state's choice of law rules.  Klaxon Co. v. Stentor Elec. Mfg., Co., 313 U.S. 487, 496-97 (1941); Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 433 (2d Cir. 2012). Under New York's choice-of-law rules, "the first step in any choice of law inquiry is to determine whether there is an 'actual conflict' between the laws invoked by the parties."  Booking v.

---

[6]In the complaint, plaintiff also seeks, pursuant to all four of its claims, attorneys' fees and costs incurred in this matter and the Wilson matter (Compl., ¶¶ 26, 35, 40, 46; see also Volsky Decl., ¶ 24).  However, in its brief, plaintiff concedes that its tort claims "ordinarily do not lend themselves to the grant of attorneys fees" and instead argues that plaintiff is entitled to attorneys' fees and costs by virtue of an indemnification provision in the Consulting Agreement (Pl. Memo, at 14).  Accordingly, because plaintiff now appears to seek attorneys' fees and costs pursuant to its contract claim only, I will address plaintiff's request for attorneys' fees and costs in connection with that claim.

Gen. Star Mgmt. Co., 254 F.3d 414, 419-20 (2d Cir. 2001), citing
In re Allstate Ins. Co., 81 N.Y.2d 219, 223, 613 N.E.2d 936, 937,
597 N.Y.S.2d 904, 905 (1993); accord Desir Austin Austin v. Ray's
Rapid Transporting LLC, No. 13 CV 912 (VMS), 2015 WL 9412542 at
*5 (E.D.N.Y. Dec. 21, 2015).

     33.  The two jurisdictions whose law is potentially
applicable here are New York, where plaintiff has its principal
place of business, and the District of Columbia, where the
conduct in issue occurred, and the law of New York and the law of
the District of Columbia are not materially different with
respect to both the standards for a tortious-interference-with-
contract claim and the damages available on such a claim.

     34.  Under both New York and District of Columbia law,
to establish a claim of tortious interference with contract, a
plaintiff must show (1) the existence of a valid contract, (2)
the defendant's knowledge of the contract, (3) the defendant's
intentional procurement of a breach of the contract and (4)
damages resulting from the breach.  Kleartex (U.S.A.), Inc. v.
Kleartex SDN BHD, 91 Civ. 4739 (LAP), 1994 WL 733688 at *10
(S.D.N.Y. June 9, 1994) (Preska, D.J.) (adopting Report & Recom-
mendation of Dolinger, M.J.) (New York law); Paul v. Howard
University, 754 A.2d 297, 309 n.23 (D.C. 2000) (applying the law
of the District of Columbia).

35.   Additionally, under both New York and District of Columbia law, the damages plaintiff seeks are available on a tortious-interference-with-contract claim.  Kleartex (U.S.A.), Inc. v. Kleartex SDN BHD, 91 Civ. 4739 (LAP), 1994 WL 733688 at *10 (S.D.N.Y. June 9, 1994) (Preska, D.J.) ("[R]ecoverable damages on [a tortious-interference-with-contract] claim 'include . . . the pecuniary loss of the benefits of the contract . . . .'" (quoting Restatement (Second) of Torts § 77A(1) (1979))); Paul v. Howard University, 754 A.2d 297, 309 n.23 (D.C. 2000) ("One who intentionally and improperly interferes with the performance of a contract . . . is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." (quoting Restatement (Second) of Torts § 766 (1979))).

  1.   How Plaintiff's
    Damages Are Calculated

36.   Plaintiff has submitted an affidavit seeking $2,538,201.45 in damages for amounts owed by Dr. Wilson pursuant to certain outstanding CAPAs and the Refinancing Agreement (Declaration of Daniel Zolberg in Support of Plaintiff's Application for Damages upon Inquest, dated Sept. 12, 2013 (D.I. 24)

16

("Zolberg Decl."), ¶ 5).[7]  Plaintiff states that this specific dollar amount is derived from a spreadsheet, maintained by plaintiff in the ordinary course of business, that lists all the advances made by plaintiff pursuant to contracts between plaintiff and Dr. Wilson (Zolberg Decl., ¶ 3).  The spreadsheet lists the date and amount of each advance, the underlying cases in which plaintiff made the advance, any repayments by Dr. Wilson, the date any particular advance was satisfied and, if still open, the current amount due (Zolberg Decl., ¶ 4).

        37.  Plaintiff is unclear, however, as to the number of contracts for which it seeks damages for non-payment.  At one point in its moving papers, plaintiff states that there are eight contracts that have outstanding amounts due -- the CAPAs dated February 16, 2007, March 23, 2007, April 16, 2007, June 14, 2007, July 25, 2007, January 16, 2008 and May 16, 2008, and the Refinancing Agreement (Pl. Memo, at 7-8), but at another point in its moving papers, plaintiff avers that defendant tortiously interfered with a total of forty agreements (Pl. Memo, at 11). Plaintiff does not otherwise identify these forty agreements, nor does plaintiff provide any evidence of damages incurred as a result of any interference with these unidentified agreements

---

        [7]Daniel Zolberg is plaintiff's president (Zolberg Decl., ¶ 1).

(Pl. Memo, at 11).  Additionally, in his declaration, Mr. Volsky, plaintiff's CEO, expressly states that the spreadsheet is the document "upon which plaintiff bases its claim for damages" (Volsky Decl., ¶ 6), and the spreadsheet only lists seven contracts as outstanding -- the CAPAs dated February 16, 2007, March 23, 2007, April 16, 2007, June 14, 2007, July 25, 2007 and January 16, 2008, and the Refinancing Agreement; it does not include any reference to the May 16, 2008 CAPA or list any other contract as outstanding.  I construe these various inconsistencies against plaintiff and only consider those agreements listed in the spreadsheet as outstanding in my damages analysis.  RGI Brands LLC v. Cognac Brisset-Aurige, S.a.r.l., 12 Civ. 1369 (LGS)(AJP), 2013 WL 1668206 at *6 (S.D.N.Y. Apr. 18, 2013) (Peck, M.J.) (Report & Recommendation) ("On an inquest for damages following a default, plaintiff bears the burden of proof and must introduce sufficient evidence to establish the amount of damages with reasonable certainty."), adopted at, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013) (Schofield, D.J.).

38.  Additionally, the amount owed to plaintiff according to the spreadsheet does not correspond to the amount requested in Mr. Zolberg's affidavit, despite the fact that Mr. Zolberg states that his requested dollar amount is derived from the spreadsheet (Zolberg Decl., ¶ 5).  According to the spread-

sheet, Dr. Wilson owes plaintiff $1,701,810.47 on the March 28, 2006 Refinancing Agreement, $639,000 on the February 2007 CAPA, $312,700 on the March 2007 CAPA, $312,700 on the April 2007 CAPA, $47,000 on the June 2007 CAPA, $47,000 on the July 2007 CAPA and $18,800 on the January 2008 CAPA (Pl. Exhibits, Ex. B).  In total, this amounts to $3,079,010.47, which the spreadsheet reflects in a column titled "cumulative payment if today" (Pl. Exhibits, Ex. B).  The spreadsheet also notes that Dr. Wilson has provided partial payment of $525,333.33, but is unclear whether the "cumulative payment if today" figure credits this partial payment.  In any event, regardless of whether $525,333.33 is deducted from the "cumulative payment if today" amount of $3,079,010.47 (which would result in an amount of $2,553.677.14), the amount due as reflected on the spreadsheet differs from the amount sought in Mr. Zolberg's declaration.

39.  Confusing matters further, plaintiff does not clearly explain how the amounts listed in the spreadsheet were calculated.  While Mr. Volsky states that the amounts owed are derived from proprietary financial software (Volsky Decl., ¶ 8), Mr. Zolberg states that spreadsheet is calculated "in accordance with the contractual fee rate" (Zolberg Decl., ¶ 5).  Because of this inconsistency, as well as the fact that plaintiff provides no explanation as to how the proprietary financial software

calculates amounts due, I conclude that the contractual fee rates, and not the unexplained amounts listed on the spreadsheet, are the only probative evidence of the amounts due on the contracts listed in the spreadsheet.

### 2.  Plaintiff's Actual Damages

40.  Plaintiff has submitted copies of the CAPAs dated February 16, 2007 (for $100,000), March 23, 2007 (for $50,000), April 16, 2007 (for $50,000), June 14, 2007 (for $25,000), July 25, 2007 (for $25,000) and January 16, 2008 (for $10,000) (Pl. Exhibits, Ex. A).  Plaintiff has not submitted a copy of the Refinancing Agreement.

41.  These CAPAs correspond to entries in the spreadsheet.  The spreadsheet shows six open cases with advances made as follows:  (1) February 28, 2007 - $100,000; (2) March 30, 2007 - $50,000; (3) April 19, 2007 - $50,000; (4) June 22, 2007 - $25,000; (5) July 30, 2007 - $25,000 and (6) January 30, 2008 - $10,000 (Pl. Exhibits, Ex. B).[8]

------

[8]Although the dates listed on the spreadsheet differ slightly from the official dates of each CAPA, the May 11, 2009 invoice confirms that (1) the CAPA funded on February 28, 2007 is the February 16, 2007 CAPA; (2) the CAPA funded on March 30, 2007 is the March 23, 2007 CAPA; (3) the CAPA funded on April 19, 2007 is the April 16, 2007 CAPA; (4) the CAPA funded on June 22, 2007 is the June 14, 2007 CAPA; (5) the CAPA funded on July 30, 2007
(continued...)

42.   In addition, there is an open entry in the spread-
sheet for $319,900 with a funding date of March 28, 2006, and the
comments on that entry state that it reflects funds that were
"reinvested" (Pl. Exhibits, Ex. B).  This entry appears to
reflect the Refinancing Agreement.  The May 11, 2009 invoice also
strongly suggests that this spreadsheet entry is the Refinancing
Agreement; the invoice lists a contract dated March 28, 2006 and
notes that the contract is for "refinancing" and has a principal
amount of $319,900 (Pl. Exhibits, Ex. D).[9]  I conclude, there-
fore, that the March 28, 2006 entry in the spreadsheet reflects
the amounts owed on the Refinancing Agreement.

43.   According to the spreadsheet and the May 11, 2009
invoice, the Refinancing Agreement had an initial principal
balance of $319,900 (Pl. Exhibits, Exs. B & D) and carried a
monthly fee of 5.5% in interest or $17,594.50 per month ($319,900
x .055) (Pl. Exhibits, Ex. B).  Approximately 89.5 months passed
from March 28, 2006 to September 12, 2013,[10] resulting in

---

[8](...continued)
is the July 25, 2007 CAPA and (6) the CAPA funded on January 30,
2008 is the January 16, 2008 CAPA (Pl. Exhibits, Ex. D).

[9]It appears that Mr. Volsky also makes reference to the
Refinancing Agreement in his affidavit; however, his affidavit
appears to state erroneously that the Refinancing Agreement was
entered into on March 26, 2008 (Volsky Decl., ¶ 13).

[10]Plaintiff's claim for damages includes pre-judgment
(continued...)

$1,574,707.75 in monthly fees in addition to the principal balance.  Accordingly, as of September 12, 2013, the total amount due on the Refinancing Agreement, excluding any partial payments made, is $1,894,607.75 ($1,574,707.75 + $319,900).[11]

    44.  By its terms, the February 2007 CAPA entitles plaintiff to receive $133,000 plus late fees of $55,000, with an additional $5,500 per month beginning June 16, 2008 (Pl. Exhibits, Ex. A, at 0013, 0024, 0431[12]).  Approximately 62.9 months passed from June 16, 2008 to September 12, 2013, amounting to $345,950 in additional fees.  Accordingly, as of September 12, 2013, the total amount due on the February 2007 CAPA, excluding

---

[10](...continued)
interest calculated at the contractual rate through September 12, 2013 (Zolberg Decl., ¶ 5).

    [11]Although the spreadsheet identifies the monthly fee percentage as a "simple" fee structure, it is unclear whether the monthly fee percentage is calculated based on compound or simple interest.  Under a compound interest calculation for a monthly interest rate of 5.5%, the amount owed would be approximately $38,557,545.28 ($319,900 in principal x $1.055^{89.5}$).  Neither this amount nor the simple interest rate calculated above correspond to the amount listed in the spreadsheet.  Accordingly, I construe this ambiguity against plaintiff and use a simple interest calculation.

    [12]Because plaintiff's Exhibit A, which is annexed to Pl. Exhibits, includes the February 16, 2007 CAPA, the March 23, 2007 CAPA, the April 16, 2007 CAPA, the June 14, 2007 CAPA, the July 25, 2007 CAPA and the January 16, 2008 CAPA within a single exhibit that was not filed on the Court's ECF system, I shall refer to the page numbers included on the upper-right hand corner of each page, which appear to be Bates-stamped page numbers, when citing to specific pages within each CAPA.

any partial payments made, is $533,950 ($345,950 + $55,000 + $133,000).

45.   By its terms, the March 2007 CAPA entitles plaintiff to receive $66,500 plus late fees of $27,500, with an additional $2,750 accruing every month after July 23, 2008 (Pl. Exhibits, Ex. A, at 0417).   Approximately 61.7 months passed from July 23, 2008 to September 12, 2013, amounting to $169,675 in additional fees.   Accordingly, as of September 12, 2013, the total amount due on the March 2007 CAPA, excluding any partial payments made, is $263,675 ($66,500 + $27,500 + $169,675).

46.   By its terms, the April 2007 CAPA entitles plaintiff to receive $66,500 plus late fees of $27,500, with an additional $2,750 accruing every month after August 16, 2008 (Pl. Exhibits, Ex. A, at 0036, 0046, 0059, 0069, 0229, 0240).   Approximately 60.9 months passed from August 16, 2008 to September 12, 2013, amounting to $167,475 in additional fees.   Accordingly, as of September 12, 2013, the total amount due on the April 2007 CAPA, excluding any partial payments made, is $261,475 ($66,500 + $27,500 + $167,475).

47.   By its terms, the June 2007 CAPA entitles plaintiff to receive $33,250 plus late fees of $13,750, with an additional $1,375 accruing every month after October 14, 2008 (Pl. Exhibits, Ex. A, at 0289).   Approximately 59 months passed

23

from October 14, 2008 to September 12, 2013, amounting to $81,125
in additional fees.  Accordingly, as of September 12, 2013, the
total amount due on the June 2007 CAPA, excluding any partial
payments made, is $128,125 ($33,250 + $13,750 + $81,125).

48.  By its terms, the July 2007 CAPA entitles plain-
tiff to receive $33,250 plus late fees of $13,750, with an
additional $1,375 accruing every month after November 25, 2008
(Pl. Exhibits, Ex. A, at 0278).  Approximately 57.6 months passed
from November 25, 2008 to September 12, 2013, amounting to
$79,200 in additional fees.  Accordingly, as of September 12,
2013, the total amount due on the July 2007 CAPA, excluding any
partial payments made, is $126,200 ($33,250 + $13,750 + $79,200).

49.  By its terms, the January 2008 CAPA entitles
plaintiff to receive $13,300 plus late fees of $5,500, with an
additional $550 accruing every month after May 16, 2009 (Pl.
Exhibits, Ex. A, at 0380).  Approximately 51.9 months passed from
May 16, 2009 to September 12, 2013, amounting to $28,545 in
additional fees.  Accordingly, as of September 12, 2013, the
total amount due on the July 2007 CAPA, excluding any partial
payments made, is $47,345 ($13,300 + $5,500 + $28,545).

50.  The total amount due on these seven contracts,
excluding partial payments made, is $3,255,377.75 ($1,894,607.75
+ $533,950 + $263,675 + $261,475 + $128,125 + $126,200 +

$47,345).  To date, Dr. Wilson has made partial payment of $525,333.33 on this total amount due (Pl. Exhibits, Ex. B; see also Pl. Exhibits, Ex. D; Volsky Decl., ¶ 16).  Accordingly, the amount owed plaintiff is $2,730,044.42 ($3,255,377.75 - $525,333.33).  I recommend that plaintiff be awarded this amount on its tortious-interference-with-contract claim.[13]

---

[13]Although generally "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings," Remsen Funding Corp. of New York v. Ocean W. Holding Corp., 06 Civ. 15265 (DLC), 2009 WL 874212 at *4 (S.D.N.Y. Mar. 31, 2009) (Cote, D.J.) (brackets in original), citing Fed.R.Civ.P. 54(c), and here my recommended award exceeds the $2,216,197.12 sought on this claim in the complaint, I nonetheless conclude that a $2,730,044.42 award is appropriate. While the complaint states that $2,190,635.04 was owed pursuant to the terms of the CAPAs at the time of the filing of the complaint and seeks a total award of $2,216,197.12 on plaintiff's tortious-interference-with-contract claim (Compl. ¶¶ 12, 35), paragraph 47 of the complaint, which is captioned "Unified Statement of Relief," states that plaintiff seeks pre-judgment interest in addition to its claims for compensatory damages. Accordingly, I conclude that my recommended award, which includes pre-judgment interest at the contractual rate for the period from November 11, 2009 through September 12, 2009, as discussed in paragraphs 71-76, infra, does not exceed the amount sought in the complaint.  See Braccia v. D'Blass Corp., 08 Civ. 08927 (LTS) (KNF), 2011 WL 2848146 at *4 (S.D.N.Y. June 13, 2011) (Fox, M.J.) (Report & Recommendation) ("Rule 54(c) does not preclude an award of damages where those damages were explicitly requested in the complaint and sufficiently established by the affidavits submitted by plaintiffs." (citation and quotation marks omitted)), adopted at, 2011 WL 2848202 (S.D.N.Y. July 18, 2011) (Swain, D.J.).

B.   Plaintiff's Claim for
     Tortious Interference
     <u>with Business Relations</u>

51.   Plaintiff's complaint claims plaintiff has been damaged in the amount of $2,216,197.12 from defendant's tortious interference with business relations, but the complaint provides no explanation of what that sum represents or how it was reached (Compl., ¶ 35).

52.   Similarly, plaintiff's damages submissions do not explain what, if any, damages were incurred as a result of defendant's tortious interference with plaintiff's business relations that were not also incurred as a result of defendant's tortious interference with plaintiff's contracts with Dr. Wilson. Aside from some vague references to punitive damages, the separate impact of the conduct covered by this claim is not addressed in plaintiff's brief (<u>see</u> Pl. Memo, at 14-15).[14]

53.   Even where a defendant defaults, a plaintiff must prove its damages. <u>Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.</u>, <u>supra</u>, 973 F.2d at 158; <u>Robinson v. Holder</u>, 07 Civ.

_____

[14]I note further that the $2,216,197.12 plaintiff seeks in the complaint on this claim is the same amount plaintiff seeks on its tortious-interference-with-contract claim (Compl., ¶ 26), indicating that, to the extent plaintiff seeks damages on this claim, those damages are the same damages it incurred as a result of defendant's tortious interference with contract.

5992 (DLC), 2008 WL 2875291 at *8 (S.D.N.Y. July 22, 2008) (Cote,
D.J.) (adopting Report & Recommendation of Pitman, M.J.).

54.  Because plaintiff has not provided evidence of any
damages it incurred for its tortious-interference-with-business-
relations claim that are distinct from the damages it incurred as
a result of defendant's tortious interference with contract, I
deem the claim for damages abandoned and recommend plaintiff be
awarded no damages for this claim.

        C.  Plaintiff's Claim
            for Breach of Contract

55.  Plaintiff argues it is entitled to attorneys' fees
and costs by virtue of an indemnification provision in the
Consulting Agreement (Pl. Memo, ¶ 14; see also Plaintiff's
Proposed Findings of Fact and Conclusions of Law, dated Sept. 12,
2013 (D.I. 22) ("Pl. Findings"), ¶¶ 32-33), which requires, among
other things, that defendant indemnify plaintiff for any damages
it suffers due to defendant's failure to perform his contractual
obligations (Consulting Agreement, ¶ 22).[15]

---

[15]Plaintiff does not make any claim for any other damages
arising solely from defendant's breach of contract.  Rather,
Plaintiff's Proposed Findings of Fact and Conclusions of Law
state that plaintiff's "actual damages" were incurred "as a
result of the tortious interference of defendant" (Pl. Findings,
¶ 30).

56.   Specifically, plaintiff seeks a total of $64,740.83 in attorneys' fees and costs for both this matter and the Wilson matter -- $22,083.15 in fees in this matter, $42,112.68 in fees in the Wilson matter and $545 in combined costs (Pl. Findings, ¶¶ 32, 33; Volsky Decl., ¶ 24).

57.   In support of its claim for fees, plaintiff states that its counsel billed at an hourly rate of $180 (Volsky Decl., at ad damnum clause) but provides no further explanation or documentation of how it calculated its fees and costs.  A party seeking an award of attorneys' fees must support its request with contemporaneous time records that show "for each attorney, the date, the hours expended, and the nature of the work done." N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983).  Fee applications unaccompanied by contempo-raneous records, except in very limited circumstances (none of which are applicable here), are deficient and disallowed.  N.Y. State Ass'n for Retarded Children, Inc. v. Carey, supra, 711 F.2d at 1148; accord Scott v. City of New York, 643 F.3d 56, 58 (2d Cir. 2011); Union of Orthodox Jewish Congregations of Am. v. Queseria Fiesta LLC, 12 Civ. 6059 (JPO), 2013 WL 1386965 at *3 (S.D.N.Y. Apr. 5, 2013) (Oetken, D.J.) (declining to award attorneys' fees without contemporaneous billing records); RCB Equities No. 3, LLC v. Skyline Woods Realty, LLC, No. 1:10-CV-

28

1182 (MAD)(RFT), 2013 WL 935785 at *4 (N.D.N.Y. Mar. 11, 2013)
("Here, the record lacks sufficient information to allow this
Court to award a reasonable amount for attorneys' fees and
costs."). Accordingly, plaintiff cannot obtain attorneys' fees
because it has not documented them.

58.  Plaintiff also does not provide any documentation
in support of its claim for $545 in costs.  However, the docket
sheet does substantiate that plaintiff incurred costs of $350 for
the filing fee in this action (Docket Sheet, at D.I. 1).  Like
attorneys fees, a plaintiff seeking costs must provide a factual
basis for awarding all of the costs it seeks.  See E. Sav. Bank,
FSB v. Rabito, No. 11-cv-2501, 2012 WL 3544755 at *7 (E.D.N.Y.
Aug. 16, 2012) ("[T]he court finds an inadequate factual basis
for an award of attorneys' fees and costs because plaintiff
submitted no contemporaneous time records or declarations regard-
ing costs incurred during the course of this litigation.").

59.  Because plaintiff has only substantiated its claim
for costs in the amount of $350 and has provided no records
concerning the remainder of its claimed costs or attorneys' fees,
I respectfully recommend that plaintiff be awarded $350 in costs.

D.   Plaintiff's Claim under
     New York Judiciary Law § 487

60.   Plaintiff contends that it is entitled to treble
damages under New York Judiciary Law § 487, which provides that
"[a]n attorney or counselor who . . . [i]s guilty of any deceit
or collusion, or consents to any deceit or collusion, with intent
to deceive the court or any party . . . [i]s guilty of a misde-
meanor, and . . . forfeits to the party injured treble damages,
to be recovered in a civil action."  N.Y. Judiciary L. § 487.
Section 487 "'applies to any oral or written statement related to
a proceeding and communicated to a court or party with the intent
to deceive.'"  Frederick v. Capital One Bank (USA), N.A., 14 Civ.
5460 (AJN), 2015 WL 5521769 at *12 (S.D.N.Y. Sept. 17, 2015)
(Nathan, D.J.) (emphasis in original), amended on other grounds,
2015 WL 8484560 (S.D.N.Y. Dec. 8, 2015) (Nathan, D.J.), citing
Amalfitano v. Rosenberg, 533 F.3d 117, 123 (2d Cir. 2008).

61.   Plaintiff has alleged that defendant violated
Section 487 by (a) breaching the nondisclosure provision of the
Consulting Agreement, (b) sharing confidential information with
Dr. Wilson, (c) inducing Dr. Wilson to breach the CAPAs, (d)
intentionally interfering with plaintiff's business relationship
with Dr. Wilson, (e) executing a retainer agreement with Dr.
Wilson in a matter in which defendant was to be a witness and (f)

30

conveying false, misleading, and/or inaccurate information about plaintiff's relationship with Dr. Wilson (Compl., ¶ 38; see also Volsky Decl., ¶ 18).  Of this conduct that allegedly violated Section 487, however, plaintiff has only shown that it incurred damages as a result of defendant's tortious interference with plaintiff's contracts.

      62.  Notwithstanding defendant's default,[16] I respect-fully submit that plaintiff's Section 487 claim should be dis-missed.  Apart from the fact that plaintiff has not shown that it suffered damages due to misconduct that occurred in connection with any kind of proceeding, Frederick v. Capital One Bank (USA), N.A., supra, 2015 WL 5521769 at *12 ("Because the alleged deceit predated the initiation of the lawsuit and is not 'related to a [court] proceeding,' Plaintiff fails to state a plausible claim to relief under § 487."); Jacobs v. Kay, 50 A.D.3d 526, 527, 857 N.Y.S.2d 81, 83 (1st Dep't 2008) ("[Plaintiffs] have no viable cause of action for treble damages under Judiciary Law § 487, since defendants' purported deceit did not occur during the course of a pending judicial proceeding."), all the alleged

---

[16]Even when a defendant has defaulted, the court has discretion to assess whether the facts alleged, which are considered true as a result of the default, "'establish [defendant's] liability as a matter of law.'"  Greathouse v. JHS Security Inc., 784 F.3d 105, 116 n.17 (2d Cir. 2015), quoting Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009)

conduct that forms the basis for plaintiff's Section 487 claim occurred outside of New York and is, therefore, beyond the reach of Section 487. <u>Schertenleib v. Traum</u>, 589 F.2d 1156, 1166 (2d Cir. 1978) ("We doubt it was the purpose of the New York State legislature to fasten on its attorneys criminal liability and punitive damages for acts occurring outside the state."); <u>accord</u> <u>Kaye Scholer LLP v. CNA Holdings, Inc.</u>, 08 Civ. 5547 (NRB), 2010 WL 177917 at *1-*2 (S.D.N.Y. Apr. 28, 2010) (Buchwald, D.J.).

E.  <u>Punitive Damages</u>

63.  Plaintiff also claims that it is entitled to punitive damages on its claims (Pl. Memo, at 14).

64.  In support of this claim, plaintiff makes a conclusory argument that defendant's violation of the New York Rules of Professional Conduct provides a basis for an award of punitive damages (Pl. Memo, at 11).

65.  The Preamble to the ABA Model Rules of Professional Conduct reads, in pertinent part:

> the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons.  The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule.

Model Rules of Prof'l Conduct Preamble cmt. [20] (2014).  This
suggests that the Model Rules do not provide a basis on which to
award punitive damages; I therefore conclude that plaintiff is
not entitled to punitive damages for defendant's violations of
the Model Rules.

      66.  Plaintiff also argues that "[p]unitive damage
claims based on tortious interference with contract are recover-
able where, as here, the tortious act complained of involved a
wanton or reckless disregard of the plaintiff's rights" (Pl.
Memo, at 14 (internal quotation marks and citation omitted)).
See also Int'l Minerals & Res., S.A. v. Bomar Res., Inc., 5 F.
App'x 5, 9 (2d Cir. 2001) (summary order) ("[I]n the context of
an action under New York law for tortious interference with
contract, 'an injured party can recover punitive damages when the
tortious act complained of involved a wanton or reckless disre-
gard of the plaintiff's rights.'"), quoting Universal City
Studios, Inc. v. Nintendo Co., 797 F.2d 70, 77 (2d Cir. 1986);
accord Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC,
07 Civ. 7998 (HB), 2008 WL 1710910 at *6 (S.D.N.Y. Apr. 10, 2008)
(Baer, D.J.), citing Maxan Curtain Mfg. Corp. v. Chem. Bank, 230
A.D.2d 832, 832, 646 N.Y.S.2d 701, 702 (2d Dep't 1996).[17]

---

     [17]Similarly, Washington, D.C. law permits punitive damages
                                    (continued...)

67. Plaintiff also cites some of the standards applicable to an award of punitive damages under breach-of-contract and tortious-interference-with-business-relations claims (Pl. Memo, at 14-15). However, plaintiff does not expressly assert that punitive damages are owed on those claims.

68. Further, plaintiff's conclusory statement regarding defendant's "wanton or reckless" conduct does not satisfy the "'very high threshold of moral culpability'" required for the imposition of punitive damages for tortious interference. See Blank v. Baronowski, 959 F. Supp. 172, 179 (S.D.N.Y. 1997) (Scheindlin, D.J.), quoting Giblin v. Murphy, 73 N.Y.2d 769, 772 (N.Y. 1988); accord Brown v. AXA RE, 02 Civ. 10138 (LTS)(AJ), 2004 WL 941959 at *9 (S.D.N.Y. May 3, 2004) (Swain, D.J.).

69. Most importantly, plaintiff does not specify the amount of punitive damages it seeks on any of its claims, and plaintiff's Proposed Findings of Fact and Conclusions of Law omit punitive damages from the amount recommended (Pl. Findings, ¶¶ 30-34).

---

(...continued)
if plaintiff can show defendant's conduct "was accompanied by 'fraud, ill will, recklessness, wantonness, willful disregard of the plaintiff['s] rights, or other circumstances tending to aggravate the injury.'" Park v. Hyatt Corp., 436 F. Supp. 2d 60, 66 (D.D.C. 2006), quoting Dyer v. William S. Bergman & Assocs., Inc., 657 A.2d 1132, 1139 n.10 (D.C. 1995).

70.  Accordingly, I recommend that plaintiff not be awarded punitive damages.

F.  Pre-Judgment Interest

71.  In the complaint, plaintiff states that it seeks pre-judgment interest on its claims (Compl., ¶ 47).  As noted in footnote 13, supra, plaintiff's damages submissions clarify that the pre-judgment interest plaintiff seeks consists of late fees and interest owed on the Refinancing Agreement and the CAPAs through September 12, 2013 based on the terms of those agreements (Zolberg Decl., ¶ 5).  Plaintiff's damages submissions make no other express requests for pre-judgment interest of any kind.

72.  Pre-judgment interest "is to be computed from 'the earliest ascertainable date the cause of action existed,'" Bison Capital Corp. v. ATP Oil & Gas Corp., 884 F. Supp. 2d 57, 59 (S.D.N.Y. 2012) (Stein, D.J.), quoting N.Y. C.P.L.R. § 5001; see also D.C. Code Ann. § 15-108 (pre-judgment interest begins to accrue "from the time [a debt] was due and payable").

73.  "[A] claim for tortious interference with contract accrues when the plaintiff sustains damages from the breach of contract." S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery, Inc., 10 Civ. 7547 (KMW)(RLE), 2013 WL 1234937 at *7 (S.D.N.Y. Mar. 26, 2013) (Wood, D.J.); accord ESI, Inc. v.

35

Coastal Corp., 61 F. Supp. 2d 35, 77 (S.D.N.Y. 1999) (Conner,

D.J.); see also Beard v. Edmondson & Gallagher, 790 A.2d 541, 546

(D.C. 2002) (a claim for tortious interference with contract

under District of Columbia law generally accrues "when the

plaintiff sustains a tortious injury" (citation omitted)).

74.   The complaint states that defendant began to

encourage Dr. Wilson to breach his contracts with plaintiff on or

about November 11, 2009 and that, "[t]hereafter, Michael M.

Wilson, M.D., J.D., breached his contracts" (Compl., ¶¶ 20-21,

25; see also Volsky Decl., ¶ 17).  Accordingly, I conclude that

the earliest date on which plaintiff's tortious interference

claim existed is November 26, 2009 -- fifteen days after the

signing of the retainer agreement -- and that plaintiff is owed

pre-judgment interest from that date through September 12, 2013.

Rosemeier v. Schenker Int'l, Inc., 895 F. Supp. 65, 67 (S.D.N.Y.

1995) (Kaplan, D.J.) (holding that tortious-interference-with-

contract claim accrued when third-party refused to make monthly

payments due to defendant's interference).

75.   Additionally, "[w]hen the contract provides that

interest shall be paid at a specified rate until the principal

shall be paid, the contract rate governs until payment of the

principal, or until the contract is merged in a judgment."

Williamson & Co., Inc. v. Colby Engraving & Rubber Plate Corp.,

98 Misc.2d 134, 135, 413 N.Y.S.2d 580, 581 (N.Y. Sup. Ct. Queens
Cty. 1979), quoting Stull v. Joseph Feld, Inc., 34 A.D.2d 655,
656, 309 N.Y.S.2d 985, 987 (2d Dep't 1970); accord In re Best
Payphones, Inc., No. 01-15472 (SMB), 2003 WL 1089525 at *5
(Bankr. S.D.N.Y. Mar. 10, 2003) (Bernstein, B.J.); Nuera
Commc'ns, Inc. v. Telron Commc'ns USA, Inc., 00 Civ. 9167
(RMB)(FM), 2002 WL 31778796 at *3 (S.D.N.Y. Nov. 15, 2002)
(Report & Recommendation) (Maas, M.J.), adopted in an unpublished
order, dated Nov. 27, 2002 (Berman, D.J.); Marine Mgmt., Inc. v.
Seco Mgmt., Inc., 176 A.D.2d 252, 253, 574 N.Y.S.2d 207, 208 (2d
Dep't 1991), aff'd, 80 N.Y.2d 886, 600 N.E.2d 627, 587 N.Y.S.2d
900(Mem) (1992); see also Giant Food, Inc. v. Jack I. Bender &
Sons, 399 A.2d 1293, 1303 (D.C. 1979) (same under D.C. law).

76.  Accordingly, I recommend that the contractual
interest rates and fees owed on the CAPAs and the Refinancing
Agreement from November 26, 2009 through September 12, 2013 be
considered plaintiff's award for pre-judgment interest to the
extent plaintiff seeks such interest.[18]  See Bluelinx Corp. v.

---

[18]For the Refinancing Agreement, $800,549.75 of the
previously-assessed late fees is for the period from November 11,
2009 to September 12, 2013 ($17,594.50 x 45.5 months); for the
February 2007 CAPA, $250,250 of the previously-assessed late fees
is for the same time period ($5,500 x 45.5 months); for the March
2007 CAPA, $125,125 of the previously-assessed late fees is for
the same time period ($2,750 x 45.5 months); for the April 2007
(continued...)

N.Y. Rebar Supply, Inc., No. CV 12-5916 ADS GRB, 2014 WL 4293701 at *4 (E.D.N.Y. Feb. 28, 2014) (Report & Recommendation) (awarding pre-judgment interest at contractual rate through the date of filing a motion for default because the plaintiff "only request[ed] such interest through the filing date of the instant motion"), adopted at, 2014 WL 4286003 (E.D.N.Y. Aug. 28, 2014).

G.   Post-Judgment Interest

77.   Plaintiff is entitled to post-judgment interest as a matter of right.  Schipani v. McLeod, 541 F.3d 158, 165 (2d Cir. 2008) ("[W]e have consistently held that an award of postjudgment interest is mandatory."), citing Westinghouse Credit Corp. v. D'Urso, 371 F.3d 96, 100 (2d Cir. 2004).  Accordingly, I respectfully recommend that plaintiff be awarded post-judgment interest on all sums awarded.

---

[18](...continued)
CAPA, $125,125 of the previously-assessed late fees is for the same time period ($2,750 x 45.5 months); for the June 2007 CAPA, $62,562.50 of the previously-assessed late fees is for the same time period ($1,375 x 45.5 months); for the July 2007 CAPA, $62,562.50 of the previously-assessed late fees is for the same time period ($1,375 x 45.5 months), and for the January 2008 CAPA, $25,025 of the previously-assessed late fees is for the same time period ($550 x 45.5 months).  In total, this amounts to $1,451,199.75; accordingly, I conclude that $1,451,199.75 of the recommended award for plaintiff's tortious-interference-with-contract claim consists of pre-judgment interest.

IV.  <u>Conclusion</u>

Accordingly, for all the foregoing reasons, I respect-
fully recommend that judgment be entered against defendant in the
amount of $2,730,394.42 plus post-judgment interest.[19]

V.  <u>Objections</u>

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of
the Federal Rules of Civil Procedure, the parties shall have
fourteen (14) days from receipt of this Report to file written

---

[19]I note that, in its submissions for this inquest,
plaintiff seeks a stay of the entry and enforcement of judgment,
pursuant to Fed.R.Civ.P. 62(h), pending resolution of its case in
the <u>Wilson</u> matter.  Plaintiff fears that entry of judgment
against defendant here might give rise to a setoff upon any
judgment it obtains against Dr. Wilson, whom plaintiff believes
has more assets with which to satisfy a judgment (Pl. Memo, at
16).  I recommend denying the stay plaintiff seeks.  First, it
does not appear that Rule 62(h) applies here.  <u>Frankel v. ICD
Holdings S.A.</u>, 168 F.R.D. 19, 21 (S.D.N.Y. 1996) (Kaplan, D.J.)
("[Rule 62(h)] appears to authorize a stay only pending further
proceedings in the case in which the stay is sought, not a stay
pending the resolution of a different action."), <u>citing</u> <u>In re
Mass. Helicopter Airlines, Inc.</u>, 469 F.2d 439, 442 (1st Cir.
1972).  Second, plaintiff's justification for seeking a stay --
that Dr. Wilson has more assets with which to satisfy a judgment
-- may no longer be applicable as the <u>Wilson</u> matter has been
stayed pending Dr. Wilson's bankruptcy.  Finally, plaintiff's
most recent letter to the undersigned, dated April 14, 2015,
appears to abandon this request as it seeks a directive that
plaintiff be entitled to serve via ECF a copy of the resulting
judgment on defendant, as well as an Information Subpoena
concerning defendant's assets (Plaintiff's Letter to the
Undersigned, dated Apr. 14, 2015).

objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Vernon S. Broderick, United States District Judge, 40 Foley Square, Room 415, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Broderick.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.  Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983) (per curiam).

Dated:  New York, New York
        February 23, 2016

Respectfully submitted,

HENRY PITMAN
United States Magistrate Judge

40

Copies mailed to:

Eileen T. Rohan, Esq.
Law Offices of Eileen T. Rohan
441 East Allen Street
Hudson, New York  12534

Gregory Krasovsky, Esq.
Law Offices of Gregory Krasovsky
P.O. Box 2543
Fairfax, Virginia  22031